**VIRGINIA:**

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

July 31, 2026

LAURA A. AUSTIN, CLERK
BY: /s/L. Ayers
DEPUTY CLERK

### IN THE U.S. DISTRICT COURT FOR THE
### WESTERN DISTRICT OF VIRGINIA
Roanoke Division

**NORTHERN VIRGINIA HEMP &
AGRICULTURE, LLC,**
*Address: 7815 Main St.
Middletown, VA 22645*

**REDFERN HEMP, CO.,**
*Address: 24403 Rogers Clark Boulevard,
Ruther Glen, VA 22546*

**DISTRICT HEMP BOTANICALS, LLC**
*Address: 9417 Main Street,
Manassas, VA 20110*

**PURE ELKTON MANUFACTURING, LLC**
*Address: 154 W Spotswood Avenue,
Elkton, VA 22827*

**CYPRESS HEMP II LLC**
*Address: 1818 Page Road
Powhatan, VA 23139*

**WELLNESS WARRIORS LLC**
*Address: 13140 Midlothian Turnpike,
Midlothian, VA 23113*

*and*

**SIMPLY HEMP, LLC**
*Address: 4355 Virginia Avenue,
Collinsville, VA 24078*

　　　　*Plaintiffs*,

　　　*v.*

**GOVERNOR ABIGAIL SPANBERGER,**
*Service Address: 1111 East Broad Street,
Richmond, VA 23219*

Case No.: 7:26-cv-00615 _____

1

**ATTORNEY GENERAL JAY JONES,**
*Service Address: 202 North Ninth Street*
*Richmond, VA 23219*

**COMMISSIONER OF THE**
**VIRGINIA DEPARTMENT OF**
**AGRICULTURE AND CONSUMER**
**SERVICES, CHARLES GREEN,**
*Service Address: 102 Governor Street,*
*Richmond, VA 23219*

**HEAD AND CHIEF ADMINISTRATIVE**
**OFFICER OF THE VIRGINIA**
**CANNABIS CONTROL AUTHORITY,**
**JAMIE PATTEN,**
*Service Address: 9954 Mayland Drive, Suite*
*3100*
*Richmond, VA 23233*

**THE VIRGINIA CANNABIS**
**CONTROL AUTHORITY,**
*Service Address: 9954 Mayland Drive, Suite*
*3100*
*Richmond, VA 23233*

**FREDERICK COUNTY**
**COMMONWEALTH ATTORNEY**
**HON. ROSS SPICER,**
*Service Address: 107 North Kent Street*
*Winchester, VA 22601*

**FAUQUIER COUNTY**
**COMMONWEALTH ATTORNEY SCOTT**
**HOOK,**
*Service Address: 29 Ashby Street, 3rd Floor*
*Warrenton, VA 20186*

**CAROLINE COUNTY**
**COMMONWEALTH ATTORNEY**
**BENJAMIN HEIDT,**
*Service Address: 111 Ennis Street,*
*Bowling Green, VA 22427*

2

**LOUDOUN COUNTY COMMONWEALTH ATTORNEY**
**R.D. "BOB" ANDERSON,**
*Service Address: 2 Church St. NE,*
*Leesburg VA 20176*

**ROCKINGHAM COUNTY COMMONWEALTH ATTORNEY MARSHA GARST,**
*Service Address: 53 Court Square, Suite 210*
*Harrisonburg, VA 22801*

**POWHATAN COUNTY COMMONWEALTH ATTORNEY ROB CERULLO,**
*Service Address: 3801 Marion Harland Drive*
*Powhatan, VA 23139*

**CHESTERFIELD COUNTY COMMONWEALTH ATTORNEY ERIN BARR,**
*Service Address: 9500 Courthouse Road*
*Chesterfield, VA 23832*

*And*

**HENRY COUNTY COMMONWEALTH ATTORNEY ANDREW NESTER**
*Service Address: 3160 Kings Mountain Rd., #D*
*Martinsville, VA 24112*

        *Defendants.*

## COMPLAINT

COMES NOW Plaintiffs NORTHERN VIRGINIA HEMP & AGRICULTURE, LLC, REDFERN HEMP CO., DISTRICT HEMP BOTANICALS, LLC, PURE ELKTON MANUFACTURING LLC, CYPRESS HEMP II LLC, WELLNESS WARRIORS LLC, and SIMPLY HEMP, LLC (collectively "Plaintiffs") by counsel, and states as follows for their Complaint against Defendants GOVERNOR ABIGAIL SPANBERGER, ATTORNEY

3

GENERAL JAY JONES, COMMISSIONER OF THE VIRGINIA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES CHARLES GREEN, HEAD AND CHIEF ADMINISTRATIVE OFFICER OF THE VIRGINIA CANNABIS CONTROL AUTHORITY JAMIE PATTEN, THE VIRGINIA CANNABIS CONTROL AUTHORITY, FREDERICK COUNTY COMMONWEALTH ATTORNEY ROSS SPICER, FAUQUIER COUNTY COMMONWEALTH ATTORNEY SCOTT HOOK, CAROLINE COMMONWEALTH ATTORNEY BENJAMIN HEIDT, POWHATAN COUNTY COMMONWEALTH ATTORNEY ROB CERULLO, CHESTERFIELD COUNTY COMMONWEALTH ATTORNEY ERIN BARR AND HENRY COUNTY COMMONWEALTH ATTORNEY ANDREW NESTER (collectively "the Defendants"):

**PARTIES**

1.　　Plaintiff Northern Virginia Hemp and Agriculture ("NOVA Hemp") is a limited liability corporation established in 2019 and licensed to do business in the Commonwealth of Virginia that processes, manufactures, and sells various products and substances containing THC in a retail store located in Warrenton, Virginia. Its primary manufacturing facility is located in Middletown, Frederick County, Virginia. The company holds Virginia's hemp processor license (License Number: #2026-VP112).

2.　　Plaintiff Redfern Hemp Co. ("Redfern Hemp") is a family-owned hemp farm established in 2019 operating on a 42-acre property in Ruther Glen of Caroline County in Virginia and licensed to do business in the Commonwealth of Virginia. The company is both a licensed cultivator and general store market ("Redfern Market"), specializing in locally grown, whole-plant cannabinoids and legal THC wellness solutions, and utilizing a commercial kitchen in Charlottesville for product manufacturing.

4

3. Plaintiff District Hemp Botanicals, LLC ("District Hemp") is a limited liability company, licensed to do business in the Commonwealth of Virginia. Through storefronts in Manassas and Leesburg, Virginia, District Hemp sells products and substances containing THC.

4. Plaintiff Pure Elkton Manufacturing LLC ("Pure Shenandoah") is a limited liability company established in December of 2018 and licensed to do business in the Commonwealth of Virginia. Pure Shenandoah operates a vertically integrated facility in Elkton, Virginia. Through this facility, they cultivate, process, manufacture, and sell substances and products that contain THC.

5. Plaintiff Cypress Hemp II LLC ("Cypress Hemp") is a limited liability company established in January of 2021 and licensed to do business in the Commonwealth of Virgina. Cypress Hemp operates a facility that processes, manufactures, and sells hemp products in Powhatan, Virginia.

6. Plaintiff Wellness Warriors LLC ("Kultivate Wellness") is a limited liability company, established in September 2018 and licensed to do business in the Commonwealth of Virginia. Kultivate Wellness operates a storefront in Chesterfield County, Virginia, where it sells products containing THC.

7. Plaintiff Simply Hemp ("Simply Hemp") is a limited liability company established in 2020 and licensed to do business in the Commonwealth of Virginia. Simply Hemp operates a storefront in Henry County, Virginia, where it sells products containing THC.

8. Defendant Governor Abigail Spanberger is named in her official capacity as the duly elected Governor for the Commonwealth of Virginia, who is the executive ultimately responsible for executing the laws of the Commonwealth, including those provisions contained in House Bill 30 of 2026 ("HB 30"), the biennial budget bill that was signed into law on June 29,

2026, and which alters the Commonwealth's hemp statutory amendment by eliminating the original 25:1 CBD-to-THC ratio exception and capping total THC at 2 milligrams per package starting August 15, 2026.

9.    Defendant Attorney General of Virginia Jay Jones is named as a defendant in his official capacity due to his authority to enforce the laws at issue, *see, e.g.*, Va. Code §§ 18.2-251.1:3, 18.2-371.2, 59.1-203, and 59.1-206.

10.    Defendant Charles Green is named in his official capacity as the Commissioner of the Virginia Department of Agriculture and Consumer Services due to his authority to enforce the laws at issue, s*ee, e.g.*, Va. Code §§ 3.2-4114.2, 3.2-4116, 3.2-4122, 3.2-4124, 3.2-4125, 3.2-4126, 3.2-5100, 3.2-5145.2:1, 59.1-203, and 59.1-206.

11.    Defendant Jamie Patten is named her official capacity as the Acting Head and Chief Administrative Officer of the Virginia Cannabis Control Authority due to her authority to enforce the laws at issue, s*ee, e.g.*, Va. Code §§ 4.1-604, 4.1-606.

12.    Defendant Virginia Cannabis Control Authority ("the Authority") is named as a defendant due to its authority to enforce the laws at issue, *see, e.g.*, Va. Code §§ 4.1-600, 59.1-203, and 59.1-206.

13.    Defendant Ross Spicer is named his official capacity as the Commonwealth Attorney of Frederick County, Virginia.

14.    Defendant Scott Hook is named his official capacity as the Commonwealth Attorney of Fauquier County, Virginia.

15.    Defendant Benjamin Heidt is named his official capacity as the Commonwealth Attorney of Caroline County, Virginia.

16.    Defendant R.D. "Bob" Anderson is named his official capacity as the Commonwealth Attorney of the Loudoun County, Virginia.

17.    Defendant Marsha Garst is named her official capacity as the Commonwealth Attorney of Rockingham County, Virginia.

18.    Defendant Rob Cerullo is named his official capacity as the Commonwealth Attorney of Powhatan County, Virginia.

19.    Defendant Erin Barr is named in her official capacity as the Commonwealth Attorney of Chesterfield County, Virginia.

20.    Defendant Andrew Nester is named in his official capacity as the Commonwealth Attorney of Henry County, Virginia.

## JURISDICTION AND VENUE

21.    This action addresses matters arising under the United States Constitution, particularly the Takings Clause of the 5th Amendment and the Due Process Clause of the 14th Amendment.

22.    This Court has original jurisdiction under 28 U.S.C. §§ 1331, as well as 42 U.S.C. § 1983.

23.    This Court has supplemental jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367(a) because they arise from a common nucleus of operative facts and form part of the same case or controversy as the federal civil rights claims.

24.    This Court has personal jurisdiction over all Defendants because they reside in the Commonwealth of Virginia and/or the conduct giving rise to this action occurred within this forum state.

25.     This Court has authority to award the requested injunctive relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events giving rise to the claims occurred within this District and this Division, specifically the raising, processing and sale of hemp in those counties within this Court and this Division.

<u>**STATEMENT OF FACTS**</u>

***History of Hemp Production in Virginia***

27.     For most of American history, hemp has been a reliable choice for farmers because of its impressive yield and the strong rope that could be made from its fibers. This was true along the East Coast, but especially so in Virginia. Growers noted that hemp, from the *cannabis sativa* plant, could be more productive than tobacco, since hemp could grow forever in the same spot while tobacco depleted the soil of its nutrients.[1] Because of this, the recognition of hemp in the legislative process began early in American history, though it was vastly different from modern statutory enactments.

28.     In 1619, the Jamestown colony required all citizens to grow Indian hemp, a declaration that soon spread to other colonies.[2]

29.     In 1633, the Virginia House of Burgesses ordered "that every planter as soon as he may, provide seede of flaxe and hempe and sowe the same."[3] Between 1763 and 1769, a citizen

---

[1] *See* Ben Swanson, *Hemp & Flax in Colonial America* (hereafter "Hemp & Flax"), Colonial Williamsburg, https://research.colonialwilliamsburg.org/foundation/journal/Winter15/hemp.cfm (last accessed Jul. 9, 2026).
[2] *See The Long, Fascinating History of Hemp in the United States* (hereafter "Colonial Virginia"), The Hemp Plastic Company, (Nov. 30, 2021).
[3] *See Hemp & Flax*, *supra* note 1.

could be jailed for not growing hemp during particular periods of shortage.[4] By the end of the Revolutionary War, Virginia alone produced 5,000 tons of hemp per year.[5] Even George Washington, the Father of our Country, had hemp growing on his land in Mount Vernon.

30.     The hemp industry flourished throughout the 19th century and into the 20th century. People invented hundreds of uses for hemp, such as fabric, carpets, weed suppression, insulation, oil paints, birdseed, and salad oil. Hemp is a variety of the *cannabis sativa*, which is the same plant as marijuana. People began to indulge more in the mind-altering components of the plant, including the psychoactive component, Tetrahydrocannabinol (THC), and a non-psychoactive component, Cannabidiol ("CBD").

31.     In 1906, the Pure Food and Drug Act provided the first guidance for federal statutory amendment of hemp and marijuana.[6] These and other drugs continued to be legal as long as they were properly labelled.[7] By 1916, using hemp for fabric and clothing had mostly been replaced by materials like cotton. So, when the Department of Agriculture wanted to promote further production of hemp as paper material, other industry leaders lobbied against it, citing the plant's potential psychoactive effects.[8]

32.     In 1937, the United States Congress passed the Marijuana Tax Act, criminalizing the non-medicinal use of cannabis, regardless of THC content.[9] This was the first Federal restriction on hemp, but did not completely preclude its production.

---

[4] *See* G. M. Herndon, *Colonial Virginia*, 37 Agric. Hist. 92 (1963).
[5] *See Colonial Virginia*, *supra* note 2.
[6] *See* Pure Food and Drug Act of 1906, Pub. L. 59-384, 34 Stat. 768 (repealed 1938).
[7] *See id.*
[8] *See Colonial Virginia*, *supra* note 2.
[9] *See* Marijuana Tax Act of 1937, Pub. L. No. 75-238, 50 Stat. 551 (repealed 1970).

33.     Hemp production came to a grinding halt in 1970, when Title II of the Comprehensive Drug Abuse Prevention and Control Act, called the Controlled Substances Act, completely banned the growing of cannabis plants, regardless of THC content.[10]

***Federal and State Legislation***
***Leads to the Legalization of Hemp***

34.     In 2014, Congress passed the Agricultural Act, also known as "the Farm Bill," federally legalizing industrial hemp production under certain conditions.[11] Congress recognized that industrial hemp and marijuana production could be distinguished and that growing techniques could minimize the amount of THC in a product. The hemp product (i) had to be cultivated for academic research under the Hemp Research Pilot Program,[12] (ii) under a production process compliant with individual state law, and (iii) had to have a THC content of 0.3% or less on a dry weight basis.[13] The THC compounds particularly of interest were Delta-9-THC.

35.     In 2015, in specific response to the Farm Bill, the Virginia General Assembly amended the Virginia Drug Control Act, redefining industrial hemp as *cannabis sativa* with a THC concentration no greater than that allowed by federal law.[14] It also approved certain licensed growers to engage in hemp cultivation for university-managed research programs and for specific wellness treatment.[15]

---

[10] *See* Controlled Substances Act of 1970, Pub. L. 91-513, tit. II, 84 Stat. 1242.
[11] *See* Agricultural Act of 2014 (the "2014 Farm Bill"), Pub. L. 113-79, 128 Stat. 649.
[12] *See* 7 U.S.C. § 5940 (2014).
[13] *See* 2014 Farm Bill, 128 Stat. 913.
[14] *See* Va. Code § 54.1-3401.
[15] *See* Va. Code § 3.2-4113 (2015).

36.     With the 25 to 1 exception, the program saw enough success that, from 2017 to 2018, the amount of hemp planted as part of the program nearly doubled from 78 to 135 acres.[16] As part of the program, the Assembly granted the Commissioner of the Virginia Department of Agriculture and Consumer Services ("VDACS") authority to regulate the hemp growing program.[17] These responsibilities included instituting and maintaining a licensing program for growers.[18]

37.     In 2018, the Agriculture Improvement Act, passed by U.S. Congress, removed hemp from the Federal "Controlled Substances List" as long as a hemp product was under a threshold of 0.3% THC content.[19] As a response, in 2019, the Virginia legislature removed the requirement that domestic growers must partner with universities.[20] This change led to the immediate growth of the privately-owned hemp processing and production industry across Virginia.

38.     By the end of 2019, there were already 191 registered industrial hemp processors, 55 registered industrial hemp dealers, and 955 registered industrial hemp growers in Virginia.[21] In 2019, farmers successfully planted approximately 2,200 acres of industrial hemp in Virginia.[22]

### The Tortured Path of Marijuana Legalization

39.     Virginia has historically distinguished between lawful industrial hemp and accompanying hemp products and recreational marijuana. Legislation introduced during the 2021

---

[16] *See* Virginia Department of Agriculture and Consumer Services, *Annual Report on the Status and Progress of the Industrial Hemp Research Program*, 1 (Dec. 1, 2018).
[17] *See* Va. Code § 3.2-801.
[18] *See* Va. Code § 3.2-4116.
[19] *See* 21 U.S.C. § 802 (16) (the "2018 Farm Bill").
[20] *See* Va. Gen. Ass. HB 1839 Reg. Sess. (2019).
[21] *See* Virginia Department of Agriculture and Consumer Services, *Report on Virginia's Industrial Hemp Program Fees (Chap. 654, 2019)*, 1, 4 (2019).
[22] *See id*. at 3.

General Assembly session defined "marijuana" as "means any part of a plant of the genus Cannabis whether growing or not, its seeds, its resin, or any extract containing one or more cannabinoids; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or its resin.[23]

40.     The legislation further stated that "Marijuana" excludes "(i) industrial hemp, as defined in § 3.2-4112, that is possessed by a person registered pursuant to § 3.2-4115 or his agent or (ii) a hemp product, as defined in § 3.2-4112, containing a tetrahydrocannabinol concentration of no greater than 0.3 percent that is derived from industrial hemp, as defined in § 3.2-4112, that is grown, dealt, or processed in compliance with state or federal law."[24]

41.     During the same session, the General Assembly considered comprehensive cannabis legislation covering cultivation, manufacturing, sale and possession, license, and penalties. This legislation focused on the broader commercial cannabis market, not solely personal marijuana possession.

42.     The 2021 legislative framework established separate licenses and regulatory requirements for cultivation, manufacturing, retail, and testing facilities. It also authorized regulatory oversight and civil penalties for violations.

43.     Yet ultimately the 2021 legislation failed to create a legal market for commercial marijuana, instead just legalizing individual use and possession. As a result, the commercialization of marijuana was delayed for the next five years.

---

[23] S.B. 1243, 2021 Leg., Spec. Sess. I, at ln. 462-64 (Va. 2021) (unenacted). https://legacylis.virginia.gov/cgi-bin/legp604.exe?211+ful+SB1243+pdf
[24] *See id.* at ln. 3423-27.

*Back to Hemp ....*

44.     While the marijuana market remained nascent, Plaintiffs operated lawful hemp-growing businesses in Virginia. They obtained and maintained all required registrations, licenses, and invested significant resources in growing the hemp businesses.

45.     Virginia lawmakers did not let this rapidly growing industry proceed without strict statutory recognition. On November 19, 2021, the USDA approved the VDACS plan to regulate hemp production according to the standards in the 2018 Farm Bill.[25]

46.     Comparing the 2014 Farm Bill to the 2018 Farm Bill, the federal government transitioned from a restrictive, research-based pilot program (7 U.S.C. § 5940(a)) into a commercial scheme (7 U.S.C. § 1639p and § 1639q) that legalized all hemp-derived cannabinoids, isomers, and extracts.

47.     Since the formal recognition over eight years ago, the industry of legal hemp production has proliferated, especially in rural Virginia, with producers operating under the THC content standards set by the 2018 Farm Bill and the 2019 amended Virginia drug statutes.

### *Passage of 2023 Law in Virginia; Industry Adjusts*

48.     In 2023, VDACS created an Office of Hemp Enforcement to ensure that products sold by licensed manufacturers met 29 state requirements in order to be approved for human consumption.[26]

---

[25] *See* Virginia Department of Agriculture and Consumer Services, *Industrial Hemp*, https://www.vdacs.virginia.gov/plant-industry-services-hemp.shtml (last accessed Jul. 9, 2026); *See also* Virginia Department of Agriculture and Consumer Services, *Plan to Regulate Hemp Production in the Commonwealth of Virginia*, https://www.vdacs.virginia.gov/pdf/Virginia-Hemp-Production-Plan.pdf.

[26] *See* VDACS Office of Hemp Enforcement, *Edible Hemp Products Inspection*, https://www.vdacs.virginia.gov/pdf/ohe_compliance_handout.pdf (June 17, 2024).

49. That same year, the industry shifted to the enactment of the Senate Bill (SB) 903. The act changed the definition of "hemp products," reiterating the 0.3% THC content requirement.[27] It also added an exception: a hemp product made for human consumption is allowed to contain 2 mg or more THC per package as long as the entire package stays within the ratio of 25 parts CBD to 1 part THC.[28] Growers have been operating under this "25:1" ratio ever since.

50. Relying upon this established state and federal framework, Plaintiffs invested substantial capital, leased retail brick-and-mortar facilities, and processed and manufactured hemp products complying with the Commonwealth's allowance and exception of a 25:1 CBD-to-THC ratio for products exceeding 2 milligrams of total THC per package.

51. Between 2023 and 2026, for example, Redfern expanded its hemp business and business footprint in Virginia through substantial investments in seed breeding and genetics, manufacturing capacity, equipment, inventory, product development, and retail and wholesale operations. These investments increased the company's ability to cultivate, manufacture, distribute, and sell hemp products.

52. Rather than abandon the Virginia market after the enactment of the 2023 law, Redfern committed substantial resources to bringing its operations and products into compliance. Among other measures, the company reformulated products, redesigned packaging and labels, increased laboratory testing, strengthened internal compliance procedures, and maintained all required licenses and registrations in good standing.

53. The company also continued making these investments despite a significant contraction in the hemp industry in Virginia. From 2023 through 2026, the company continued

---

[27] *See* Va. Code § 3.2-4112 (defining "hemp product").
[28] *See* Va. Code §§ 3.2-4112, 3.2-5145.1.

purchasing inventory and equipment, developing new products, expanding its retail and wholesale operations, and investing in manufacturing and seed-breeding activities. These expenditures were made in reliance on the company's continued ability to operate lawfully under Virginia's hemp regulatory scheme and represent substantial resources that cannot readily be recovered or redirected if the new Hemp Prohibition prevents or materially restricts the company's operations.

54.     Redfern's story is a notable example but not an isolated one. Each Plaintiff likewise in this complaint made substantial investments to create, maintain, and expand its business in reliance on Virginia's hemp regulatory scheme that permits the manufacturing, sale, and distribution of hemp products.

### *2026 General Assembly Takes Up Legalization of Marijuana*

55.     As mentioned above, in 2021, the General Assembly took its first tentative steps to legalizing marijuana in adopting a multi-year plan with the idea that a regulated and taxed market would eventually be created.

56.     However, with the election of Governor Glenn Youngkin in the fall of 2021, the legalization of marijuana stalled. Indeed, repeated attempts in 2022-2025 to create a legal industry were either defeated in the General Assembly or were vetoed by the Governor.

57.     With the election of Governor Spanberger and her taking office in January 2026, the proponents of legalization sensed a new opportunity. However, the General Assembly in 2026 could not agree on the details of a bill to legalize a market for recreational marijuana, especially after the Governor's amendments to SB 542 were "passed by" in the Senate – thus defeated without a vote.

58.     With no legislative alternative left, the marijuana legalization advocates relied on the biennial budget bill (HB 30) to accomplish their policy objectives.

***Use of Budget Conference to Pass "Legalization" in June 2026;***
***Inherent Conflicts at Core of that Decision***

59.    Within the General Assembly, legislation can be passed in two ways: (i) it can be reported from committee, then read three times on the floor of the House and Senate, respectively, before being passed by a recorded vote or (ii), if the bodies pass conflicting versions of the same bill, the competing versions are reconciled in a "Conference Committee," whose "conference report" must later be approved by each body. In the latter case, the "conferees" are selected by the chair of the Committee which had considered the original bill. Once the conference committee is issued, it goes to the floor for an "up or down" vote by each body.

60.    By June of 2026, the legislative vehicle for legalizing marijuana, SB 542, was dead. Thus, there was no practical way to resuscitate the concept except through the last remaining bill of the 2026 session: the biennial budget bill.

61.    In 2026, the Budget bill had not been agreed during the General Assembly's regular session, as the House and Senate were divided on several key issues, most notably the ongoing sales tax exemption for the data center industry in Virginia. As a result, there was no adopted budget as the two bodies approached the end of the fiscal year on June 30, 2026.

62.    The closing of the fiscal year without a new biennial budget from July 1, 2026-June 30, 2028, would represent an unprecedented crisis for Virginia, as state employees literally could not be paid and state obligations would be left unmet. (Unlike the Federal government, the Virginia state government has no history of legislature-induced "shutdowns").

63.    As a result, the House and Senate conferees worked against this backdrop to enact a budget in the latter weeks of June 2026. Notably, both sets of conferees were chosen by the chairs of House Appropriations and Senate Finance: the two "budget committees." In the case of Senate

16

Finance, the chairman, L. Louise Lucas (D-Portsmouth), is the owner of a well-known cannabis dispensary.[29]

64.     With the defeat of SB 542, the attention shifted to the Budget Bill – and its conferees[30] – to craft the "legalization" language, knowing that it would be part of a larger measure, i.e.. the conference report, which would be impervious to objection or amendment due to its massive nature (representing two years of state spending) and the inability of members to amend it.

65.     On June 19, 2026, eleven days before fiscal year ended, the Budget Conference report was released. Three days later, the report was voted upon by the full House and Senate who, with no practical alternative, adopted it. On June 28, 2026, forty-eight hours before the fiscal year ended, the Budget was signed by the Governor into law.

### Conference Report Promotes "Legalization" Yet Bans Hemp Products

66.     The conference report of HB 30 ("the Conference Report"), signed into law on June 28, 2026, resulted in the full commercialization of the state's cannabinoid and cannabis markets. At the same time, and in an apparent contradiction to the very purpose of "legalization," the Conference Report provided a broad prohibition on the manufacture, distribution, and sale of hemp-derived cannabinoid products, including those previously deemed compliant with federal law.

---

[29]     https://apnews.com/article/virginia-louise-lucas-fbi-cannabis-618dd725f0797dd1117f4fed077e61c0

[30]     In a document as vast as the Virginia budget, the text is largely, if not exclusively, drafted by the staff of the Division of Legislative Services assigned to the budget-writing committees. In the case of a complex "legislative" issue which is inserted into the Budget, such as the legalization of marijuana, the text will generally be dictated to the conferees, and thus the staff, by lobbyists with a first-hand knowledge of the industry and specifically what benefits their clients. This content will thus become the "final version" of the law, as there is no opportunity for amendment in committee or on the floor.

67.     In regard to recreational marijuana, the Conference Report conferred exclusive commercial opportunities upon state-licensed marijuana operators. These entities are authorized to market, distribute, and profit from high-potency THC products, whereas substantially similar, lower-potency hemp products in Plaintiffs' inventory are subject to enhanced restrictions.

68.     In that respect, the Conference Report, while legalizing marijuana, simultaneously instituted a severe regulatory crackdown on hemp ("the Hemp Prohibition"), i.e. by altering the statutory definition of "hemp products" and removing the 25:1 exception for hemp product packages containing more than 2 mg of THC.[31] In effect, it removed Hemp from the same retail marketplace now occupied exclusively by recreational marijuana.

69.     Notably, Federal law defines "hemp" according to the concentration of Delta-9 tetrahydrocannabinol and expressly includes the Cannabis sativa L. plant and its "derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers."[32]

70.     The new Hemp Prohibition instead determines legality by reference to the total concentration or aggregate quantity of multiple forms of tetrahydrocannabinol.

71.     By deleting this standard exception provision, the final text of HB 30 strips processors of any industry-standard manufacturing tolerances. When paired with the ultra-low 2-milligram per-package cap, removing this allowance means that a chemical variance of fractions of a milligram transform a legalized hemp product into an illegal and penalized substance.

72.     Through the Conference Report, the new Hemp Prohibition creates an arbitrary divide between identical chemical compounds based solely on source or retail channel, rather than public safety. If a 3mg THC beverage is banned on a hemp retailer's shelf for "public safety," but

---

[31] *See* Va. Code §3.2-5145.4(ii)(b).
[32] *See* 7 U.S.C. § 1639o (1).

a 3mg THC beverage is completely legal and deemed safe if purchased at a state-licensed marijuana dispensary, the distinction is not based on the public safety, but on economic protectionism.

73.    Because the plain language of the statute regulates total "per package" rather than concentration, a concentrated, high-potency 1-ounce dropper bottle containing 1.9 milligrams of THC is lawful under Virginia law, despite possessing a high concentration of active cannabinoids.

74.    Conversely, a heavily diluted 12-ounce beverage or a large-volume therapeutic topical containing 2.1 milligrams of total THC is completely criminalized—even though the THC is so heavily diluted by volume that it would not cause intoxication or impairment.

75.    Plaintiffs' product-development and lab results indicate that testing beverages formulated with approximately two milligrams of total THC presents significant challenges and often yields inconsistent results. This arises because the measured quantity approaches the threshold of reliable quantification in large-volume products.

76.    As a result of the Conference Report, "the Hemp Prohibition," the legal standard relied upon by the Plaintiffs herein will remain in place only until August 15, 2026, after which all hemp products manufactured, distributed, or sold in the Virginia retail market must strictly comply with an absolute 2 milligram total THC per-package cap, or face immediate civil and criminal penalties.[33]

77.    Notably, the General Assembly had previously enacted SB 543 in April 2026 and the Virginia Cannabis Control Authority has also assumed regulatory control from VDACS, per the text of the Conference Report, which means that the Hemp Prohibition will lead to an

---

[33] *See* Va. Code § 4.1-600.

immediate crackdown on heretofore legal businesses without any compensation – as no funds are allocated in the State Budget for the shutdown of this previously legal business.[34]

78.    In sum, the elimination of the "25:1" exception has devastated the legal hemp operation, even as the General Assembly has legalized various forms of marijuana, which had not been previously legal and indeed have no history of legality in Virginia.

### *Damage to Plaintiffs and Virginia Growers from the HB 30 Conference Report*

### *NOVA Hemp[35]*

79.    NOVA Hemp's protected property interests include lawfully acquired commercial inventory, raw materials, finished goods, packaging, labels, manufacturing inputs, specialized production equipment, leasehold improvements, intellectual property, customer relationships, and other commercial assets acquired and developed in reliance upon Virginia law. As of July 13, 2026, NOVA Hemp possessed inventory with a documented value of $735,501.85.

80.    NOVA Hemp's inventory consists of finished consumer products, partially manufactured products, bulk ingredients, custom packaging, compliant product labels, manufacturing supplies, and work-in-progress inventory throughout its production process. It cannot reasonably be modified or repurposed to satisfy the newly enacted regulatory standard. As a result, the overwhelming majority of this inventory has been rendered commercially worthless.

81.    Approximately eighty-five percent (85%) of the products manufactured, distributed, and sold by NOVA Hemp immediately prior to the enactment of HB 30 now constitute "Banned Products" under Virginia law. The legislation therefore eliminates virtually the entirety of NOVA

---

[34] *See* Va. Gen. Ass. HB 30 Spe. Sess., 1-866 (2026); *See also* Va. Gen. Ass. SB 543 Reconvened Sess., 1016 (2026).

[35] A declaration in support of Nova Hemp's facts is attached hereto. See Declaration of Travis Lane, attached as Exhibit A.

Hemp's established product portfolio and deprives the company of the primary source of its revenue. Examples of SKU: (1) SKU# 020555598302 (Root Beer); (2) SKU# 020555376245 (Lavender Lemonade); (3) SKU# 020556773951 (Blackberry Lemonade) to name a few.

82.    NOVA Hemp is also barred from importing and selling any hemp products that conflict with the new regulatory standard.

83.    NOVA Hemp owes employees payroll totaling approximately $35,000 per month.

84.    NOVA Hemp possesses liabilities totaling over $150,000, which include Employer Payroll taxes, sales taxes, lease profit sharing to their lease agency, a business American Express credit card, a Comenity Bank credit card, a business line of credit through Square.

85.    NOVA Hemp owes approximately $9,000 a month to leases, a bookkeeper, tax accountant, utilities, inventory applications, and banking compliance fees.

86.    NOVA Hemp recently invested $120,000 to expand their facility to include a beverage canning and pasteurizing system. They made payments to sub-contractors, paid for permits, and already purchased the equipment. There is no way to compensate for the investment. Not being able to use the equipment would result in a loss due to changes in processing and loss of label design fees.

87.    NOVA Hemp suffered substantial losses relating to its leasehold improvements and business equipment. The leasehold improvements and drink-manufacturing equipment are valued at approximately $150,000 or more. Additional equipment is valued at approximately $150,000 and includes gummy-manufacturing equipment, silicone molds, extraction equipment, commercial printers, and losses associated with the leased van. The total estimated loss exceeds $300,000.

88.    Prior to HB 30, NOVA Hemp had developed a commercial beverage program intended for statewide distribution through Total Wine. Manufacturing plans were developed,

21

products were formulated, production capacity was expanded, and distribution logistics were established. Following enactment of HB 30, Total Wine abandoned the project because the products could no longer legally be sold under Virginia law. NOVA Hemp consequently lost both the anticipated commercial opportunity and the value of products and preparations already undertaken in reliance upon that agreement.

89.     In February of 2026, NOVA Hemp also planned a project partnership with Redfern Hemp for a white label beverage line. However, Redfern is no longer able to invest in the project.

90.     Collectively, the cancellations of the Total Wine and Redfern Hemp projects have resulted in an estimated more than $250,000 in lost sales opportunities, including losses associated with products already manufactured, production materials already purchased, custom packaging, product development, formulation costs, and related expenditures made before the regulatory changes.

91.     The additional cost incurred by attempting to remain in compliance and apply for the new license would be $200,000.

92.     Nova Hemp is under contract with First Citizens Bank for their Clover and Merchant Services, which they cannot exit and are obligated to pay thousands every month.

93.     As a direct consequence of HB 30, NOVA Hemp's business model has been substantially destroyed. The company cannot lawfully sell the products that historically generated approximately eighty-five percent (85%) of its revenue, yet it remains responsible for fixed operating expenses, payroll obligations, debt service, lease obligations, regulatory compliance costs, and contractual commitments. Unless relief is granted, NOVA Hemp will be forced to eliminate employee positions (incurring high unemployment taxes), significantly reduce operations, and face the imminent closure of both its retail location and manufacturing facility.

22

94.     Prior to the enactment of HB 30, NOVA Hemp generated approximately $150,000 in monthly gross sales. As a direct result of HB 30, NOVA Hemp stands to lose the overwhelming majority of its monthly revenue while remaining responsible for its fixed operating expenses, payroll, taxes, leases, and other contractual obligations.

95.     NOVA Hemp cannot repurpose the hemp products that will become illegal under the new law. Even if it could, the cost to repurpose these products would create an undue burden for the business.

96.     Over approximately seven and a half years, NOVA Hemp has invested several million dollars in developing and growing the company. This began in 2019, when they participated in Virginia's Industrial, Hemp Research Program, and persisted through the collapse of the wholesale hemp market and COVID.

97.     During most of that period, the owner of the company did not take a salary so that available funds could be reinvested into the business. Only within the past two years did the company reach a level of stability and profitability that allowed the founder to receive a reasonable salary. This is directly because of SB 903, which allowed the owner to comfortably invest in more leasehold improvements and edible products in 2024, as well as dietary supplement and beverage production in 2025,

98.     Prior to the enactment of HB 30, NOVA Hemp had an estimated going-concern value in excess of $3.5 million, reflecting approximately seven and a half years of business development, substantial capital investment, established customer relationships, proprietary branding, inventory, manufacturing assets, and commercial goodwill. As a direct result of the enforcement of the Hemp Prohibition, NOVA Hemp and its owners have suffered substantial losses,

23

including the loss of business value, invested capital, inventory, revenue, income, commercial opportunities, and anticipated future profits.

99.    NOVA Hemp is also harmed because its owners and its employees may face criminal charges under Va. Code §§ 18.2-247 and 371.2 for possession of Banned Products that were previously considered legal.

*Cypress Hemp*

100.    Cypress Hemp's protected property interests include lawfully acquired commercial inventory, raw materials, finished goods, packaging, labels, manufacturing inputs, real property, property improvements, specialized production equipment, intellectual property, customer relationships, and other commercial assets acquired and developed in reliance upon Virginia law.

101.    As of July 23, 2026, Cypress Hemp possessed inventory in Virginia with a documented value of $1,828,000. Due to the enforcement of the new Hemp Prohibition, approximately $1,437,355 worth of this compliant hemp product inventory—representing 78.62% of Cypress Hemp's Virginia business assets—will instantly become illegal on August 15, 2026. Those products account for approximately 95% of Cypress Hemp's current revenue.

102.    The hemp products expected to remain legal represent roughly 20% of the company's portfolio but have historically generated only about 5% of its revenue. Cypress Hemp is forced to continue their business relying on products that are far less in demand and lucrative than prior offerings.

103.    Cypress Hemp's inventory consists of finished products and supplies that cannot be reasonably modified or repurposed to satisfy the newly enacted regulatory standard. As a result, the overwhelming majority of this inventory has been rendered commercially worthless.

104.    Cypress Hemp sells wholesale to 370 businesses in Virginia. Some of those businesses include other Plaintiffs. For that reason, the impact on the company is likely a strong reflection of the impact of the new Hemp Prohibition on the wider hemp industry in the Commonwealth.

105.    Much of the hemp product inventory was purchased, manufactured, packaged, and prepared for sale when the products were lawful. Cypress Hemp is attempting to sell some of the affected inventory in other markets, but there is no guarantee that those efforts will succeed. Any inventory that cannot be relocated or sold will become a direct loss.

106.    Cypress Hemp has spent more than $50,000 training two employees whose positions have already been eliminated. Additional layoffs are likely after August 15, 2026, when the effects of the new restrictions are expected to become more severe. These layoffs will create further financial harm, including possible increases in unemployment-related taxes and the loss of experienced personnel who have taken years to recruit and train.

107.    Cypress Hemp also spent more than $50,000 training four independent sales contractors whom they can no longer use.

108.    As of July 23, 2026, Cypress Hemp also carried approximately $151,260 in credit card debt on two Capital One accounts. One account had a balance of approximately $85,663, and the second account had a balance of approximately $65,597.

109.    These balances reflect, in significant part, money spent maintaining operations, purchasing inventory, developing products, and preparing the business to comply with Virginia's changing requirements, including the 2023 law introducing the "25 to 1" ratio.

110.    Cypress Hemp has already spent approximately $345,000 attempting to adapt to the new requirements and remain in business. These expenditures include the development of an

entirely new Virginia product portfolio, new product formulations, design work, employee labor, packaging, and related compliance efforts.

111. These were not ordinary expansion costs. Cypress Hemp committed this new investment because it was trying to survive a sudden regulatory change and preserve its ability to operate in Virginia. In this case, the company has been forced to invest its remaining capital into new products without knowing whether consumers want them, whether retailers will carry them, or whether those retailers will still be operating after the new rules take effect.

112. For example, Cypress Hemp entered into a five-year commercial lease with a total obligation of approximately $500,000, or approximately $100,000 per year. The company remains responsible for that lease even though the regulatory changes have eliminated or severely impaired the revenue stream that was expected to support the obligation.

113. In addition to the lease itself, the company has made substantial investments in property, equipment, and facility improvements that may lose all their practical value if the business cannot continue operating at its current scale. These investments include more than $25,000 in metal pallet rack systems used to store and manage inventory. The Company also invested more than $30,000 in its retail buildout. An additional $40,000 or more was invested in HVAC systems, mini-split units, warehouse improvements, farming operations, and related infrastructure.

114. These improvements were made in reliance on the Company's ability to continue manufacturing, distributing, and selling products that were legal when the investments were made.

115. Cypress Hemp's Virginia wholesale business generates approximately $6,000,000 per year from ingestible products that were lawful before the regulatory change. Even products that technically remain legal are likely to suffer because the new rules will eliminate distribution

26

points, reduce retailer participation, weaken customer demand, and cause broader deterioration throughout the industry.

116.    Cypress Hemp also operates a Virginia retail store that generates approximately $180,000 per year. That retail revenue is likewise at risk because the products responsible for the overwhelming majority of customer demand will no longer be available.

117.    Cypress Hemp's annual Virginia revenue exposure is therefore at least $6,180,000, before accounting for indirect losses involving pet products, topical products, reduced distribution, damaged customer relationships, and the broader decline of the Virginia market.

118.    Cypress Hemp has not been given a realistic transition period, a workable alternative distribution channel, or any meaningful way to continue serving Virginia consumers, once the Hemp Prohibition takes effect.

119.    This sudden legislative mandate forces uncompensated liquidation and destruction of more than half of Cypress Hemp's inventory value, causing immediate and irreparable injury.

120.    Cypress Hemp is also harmed because its owners and its employees may face criminal charges under Va. Code §§ 18.2-247 and 371.2 for possession of Banned Products that were previously considered legal.

*District Hemp*

121.    District Hemp processed and manufactured products containing CBD pursuant to a valid Virginia registration issued by VDACS since its inception as a limited liability company in 2017. District Hemp obtained the license to sell hemp products in 2019 and a license to process hemp products in 2021. During the relevant period, District Hemp developed a substantial customer base and sold products to more than 50,000 customers.

122.    As a result of the enforcement of the new Hemp Prohibition, District Hemp cannot easily replace the affected products with the ones that comply with the new requirements. Developing and manufacturing replacement products would require new equipment, training, product formulation and design, testing, packaging, and other substantial operational changes. The costs associated with those changes are presently impossible to absorb given District Hemp's current financial condition.

123.    Although District Hemp has been able to sell most of its inventory that will become statutorily noncompliant, District Hemp still possesses approximately $10,009 in affected products that must be sold before the new restrictions apply or otherwise lost.

124.    District Hemp acquired these hemp products at a time when they fully complied with all then-applicable requirements of Virginia law. District Hemp acquired its remaining inventory and incurred substantial business obligations in reasonable reliance on the continued legality of its operations and products.

125.    In 2020, the owner of District Hemp took out a 30-year SBA loan to maintain operations and staff during shutdown. The owner obtained financing with the expectation that the company would be permitted to continue lawfully manufacturing and selling its products for years to come.

126.    The owner of District Hemp signed a three-year lease in 2024 under the assumption that the industry would remain sustainable.

127.    District Hemp currently owes a total of $181,344.46 to various creditors.

128.    Its employees have already been affected. Under its previous operations, District Hemp incurred approximately $6,000 in bi-weekly payroll expenses. Because of the financial

strain caused by the new Hemp Prohibition and the company's inability to continue its prior scale of operations, District Hemp could no longer afford those payroll expenses and terminated its staff.

129. District Hemp is further harmed as the company will have to cancel the lease for its retail location in Leesburg, Virginia. District Hemp projects that its lease-termination obligations and related costs will total approximately $50,000.

130. Based on its outstanding loans, credit obligations, and projected lease-exit costs, District Hemp presently projects financial losses and liabilities totaling approximately $231,344.46 from the Hemp Prohibition. That amount does not include the separate $10,009.41 in remaining inventory that may become unsalable, the previously incurred payroll expenses, the unquantifiable costs of attempting to redesign District Hemp's business and products, or the additional costs and damages.

131. District Hemp also anticipates incurring additional damages, professional fees, administrative expenses, and other costs associated with a potential bankruptcy filing necessitated by the financial unsustainability of its business resulting from enforcement of the new Hemp Prohibition.

132. District Hemp is also harmed because its owners and its employees may face criminal charges under Va. Code §§ 18.2-247 and 371.2 for possession of Banned Products that were previously considered legal.

*Redfern Hemp Co. & Redfern Market*

133. Redfern Hemp Co. and Redfern Market possess property interests that include lawfully acquired commercial inventory, raw materials, finished goods, specialized production equipment, real property, leasehold improvements, intellectual property, customer relationships, and other commercial assets acquired and developed in reliance upon Virginia law.

29

134.    As of July 2026, Redfern Hemp Co. possessed inventory with a documented value of $350,000. Of this amount, $200,000 worth of inventory will be non-compliant by the new law.

135.    As of July 2026, its retail companion Redfern Market possessed inventory with a documented value of $150,000. Of this amount, $70,000 worth of inventory are soon to be non-compliant with the law.

136.    These products cannot reasonably be modified or repurposed to satisfy the newly enacted regulatory standard. As a result, the overwhelming majority of this inventory has been rendered commercially worthless.

137.    Redfern Hemp Co. and Redfern Market have invested a significant amount of funds in materials, additions, and other property for the purpose of expanding their businesses.

138.    Redfern Hemp Co. and Redfern Market spent $175,000 on equipment and $20,000 on a greenhouse in order to expand their production abilities.

139.    Redfern Hemp Co. and Redfern Market have utilized a United States Department of Agriculture (USDA) grant of $22,000 to begin building a new greenhouse, as a result of necessary business costs. However, because of the changes due to these statutory amendments, this construction has been placed on hold.

140.    Redfern Hemp Co. and Redfern Market incur losses every month from maintaining payroll, despite decreased sales as a direct result of purchaser uncertainty following approval of the Hemp Prohibition.

141.    Redfern Hemp Co. owes $2,700/week in employee payroll. Redfern Market owes $3,100/week in employee payroll. These costs have become harder to bear since the Hemp Prohibition and may result in necessary layoffs.

142.    Redfern Hemp Co. and Redfern Market pay anywhere from $5,000-7,000/month in commissions. All of these invested costs will be lost if the Hemp Prohibition takes effect.

143.    Redfern Hemp Co. sells wholesale to 452 companies across Virginia. As a result of the Hemp Prohibition, Redfern Hemp Co. and Redfern Market have suffered loss of business opportunities with other companies. In February of 2026, Redfern Hemp Co. planned a project partnership with NOVA Hemp for a white label beverage line. However, Redfern Hemp Co. is no longer able to invest in the project, resulting in approximately $150,000 in loss of projected future earnings for Redfern Hemp Co. and Redfern Market. Redfern Hemp Co. has lost multiple wholesale accounts as other hemp companies close and cancel orders, resulting in an approximate $75,000+/month loss. This is because businesses have stopped buying products out of fear that they will soon be non-compliant.

144.    Redfern Hemp Co. and Redfern Market project a total loss of $110,000-$150,000 from these failed deals, contract cancellations, and other financial disruptions caused by the change in statutory amendments.

145.    Redfern Hemp Co. and Redfern Market currently have leases for multiple properties that are directly tied to the functioning of their businesses, as well as the following monthly expenses:

- $1,500/month for their farm.

- $2,600/month for their commercial kitchen.

- $1,600/month for their retail store.

- $2,100/month for repayment of loans.

146.    Redfern Hemp Co. and Redfern Market have not been given a realistic transition period, a workable alternative distribution channel, or any meaningful way to continue serving Virginia consumers before August 15, 2026.[36]

147.    Redfern Hemp Co. and Redfern Market are also harmed because the owners and employees may face criminal charges under Va. Code §§ 18.2-247 and 371.2 for possession of Banned Products that were previously considered legal.

*Kultivate Wellness*

148.    Kultivate Wellness' protected property interests include lawfully acquired commercial inventory, finished goods, intellectual property, real property, customer relationships, and other commercial assets acquired and developed in reliance on Virginia law.

149.    As of July 23, 2026, Kultivate Wellness is in possession of an inventory totaling 117,587 products. The value of these items totals $123,799.25. Of this inventory, 114,834 items that will soon be non-compliant with state law. The value of these items totals $103,454.40.

150.    Nearly 98% of those products currently in Kultivate Wellness' inventory will become non-compliant following the commencement of the new Hemp Prohibition on August 15, 2026. This is an overwhelming percentage of soon-to-be unsaleable products, which provides very little opportunity to recuperate costs and invest in plans that allow the business to continue.

---

[36]    Redfern Market serves many customers who are medically fragile and are referred to their location by a physician. Because of this Hemp Prohibition, many customers will not be able to receive the medication that they have become reliant upon. This includes Haley Smith, a 26-year-old Lancaster County woman and Redfern customer who relies on medication containing 180 mg of THC to control her seizures. If she is unable to receive this medication, the possibility of her dying because of one of her seizures shoots up exponentially.

151. Kultivate Wellness does not have an alternative method of selling the products in order to recuperate costs before and after the statutory amendments. Even if they did, it would present an undue burden for the business.

152. Kultivate Wellness projects costs of $100,000 or more for the company to create custom formulas and completely rebuild an inventory that would be compliant with the new law. Kultivate Wellness cannot afford this due to the fact that they would not be able to sell their current inventory to raise the funds.

153. Kultivate Wellness leases their storefront property, the contract of which runs out in December of 2026. The strain from the new statutory amendments on their ability to maintain revenue puts this lease at risk. If the lease is terminated, Kultivate Wellness cannot continue to operate as a business.

154. The owner of Kultivate Wellness has operated a storefront since 1999 and has contributed to the growth of the Virginia hemp industry since the beginning. They were even able to expand during COVID and began shipping 25:1 compliant products to other states between 2023-2025. However, this Hemp Prohibition has put such a strain on the industry that Kultivate Wellness might be forced to stop operations after nearly three decades as a dedicated small business.

155. As a result of the enforcement of the new Hemp Prohibition, Kultivate Wellness will likely have to terminate most, if not all, of their staff due to this loss in business.

156. Kultivate Wellness has not been given a realistic transition period, a workable alternative distribution channel, or any meaningful way to continue serving Virginia consumers before August 15, 2026.

157. Kultivate Wellness anticipates incurring additional damages, professional fees, administrative expenses, and other costs associated with a potential bankruptcy filing necessitated

33

by the financial unsustainability of its business resulting from enforcement of the new Hemp Prohibition.

158. Kultivate Wellness is also harmed because its owners and its employees may face criminal charges under Va. Code §§ 18.2-247 and 371.2 for possession of Banned Products that were previously considered legal.

*Pure Shenandoah*

159. Pure Shenandoah's protected property interests include lawfully acquired commercial inventory, manufacturing equipment, real property, packaging, labels, intellectual property, specialized production equipment, customer relationships, and other commercial assets acquired and developed in reliance upon Virginia law.

160. As of June 2026, Pure Shenandoah possessed inventory with a documented value of over $300,000. Of this amount, $250,000 worth of inventory will soon to be non-compliant as a direct result of the Hemp Prohibition. The overwhelming majority of their inventory has been rendered commercially worthless.

161. Pure Shenandoah maintains wholesale partnerships with over 300 businesses and has sold to thousands of customers through their storefront and online ecommerce platform. Pure Shenandoah is also the white-label manufacturer for over 30 brands. They stand to lose all of the partnerships that they have built because of the Hemp Prohibition.

162. Pure Shenandoah owes over $600,000 to creditors for various debts and loans they have incurred in order to maintain their business.

163. Pure Shenandoah arranged a bank loan on a new piece of equipment before the Hemp Prohibition was approved. Following this, the bank cancelled the loan upon the

34

understanding that Pure Shenandoah would not experience the revenue following enactment of the new statutory amendment.

164. Pure Shenandoah projects that this removed needed cash flow of $300,000.

165. Pure Shenandoah has made attempts to remain in compliance, such as determining the possibility of applying for new licenses. These related costs total approximately $25,000.

166. Additionally, Pure Shenandoah would need to spend over $50,000 to pivot their product production and design to prepare new products compliant with the Hemp Prohibition. This would place an incredible undue burden on the business.

167. Pure Shenandoah projects over $500,000 in total losses due to decreased business and inventory they can no longer sell.

168. Pure Shenandoah will be significantly harmed by the new Hemp Prohibition. It projects over $2 million dollars of lost opportunity costs in 2026 alone. This is due to decreased customer sales, failed business ventures because of insecurity about the legality of the company's products, and inability to grow as a business due to unanticipated and egregious financial strain.

169. Pure Shenandoah has not been given a realistic transition period, a workable alternative distribution channel, or any meaningful way to continue serving Virginia consumers before August 15, 2026.

170. Pure Shenandoah is also harmed because its owners and its employees may face criminal charges under Va. Code §§ 18.2-247 and 371.2 for possession of Banned Products that were previously considered legal.

*Simply Hemp*

171. Simply Hemp of Henry County possesses property interests that include lawfully acquired commercial inventory, finished goods, real property, leasehold improvements, intellectual

35

property, customer relationships, and other commercial assets acquired and developed in reliance upon Virginia law.

172.    As of July 30, 2026, Simply Hemp possessed hemp inventory with a documented value of $12,000. Of this amount, a total of $11,400 will soon be noncompliant because of the Hemp Prohibition. This represents 95% of their hemp inventory.

173.    These products cannot reasonably be modified to satisfy the newly enacted regulatory standard. As a result, the overwhelming majority of this inventory has been rendered commercially worthless.

174.    Simply Hemp invests a significant amount of funds in materials, additions, and other property for the purpose of expanding their business, which they have been able to do because of years of financial success. Simply Hemp has moved to increasingly larger retail spaces three times to accommodate greater demand. They currently rent two adjoining spaces.

175.    Simply Hemp owes $800/month on the hemp-focused area of their retail space.

176.    Simply Hemp would need to spend $10,000 to restock products that are compliant with the Hemp Prohibition. For a small business, this is an incredible number to achieve when they are unable to sell current inventory in order to raise the funds.

177.    Many of the compliant products that Simply Hemp stocks do not sell for sufficient value in order to justify investing in future orders consisting of only those products. Simply Hemp is forced to invest in products that see less demand and could likely expire on their shelves just to remain in compliance.

178.    Simply Hemp recently spent $1,000 on a Hemp Sellers License Application. Because 95% of their inventory will soon be unsaleable and there is no guarantee they can continue business by investing in compliant hemp products, the license has lost its value.

179.    Before the Hemp Prohibition, Simply Hemp was on track to make $500,000 total in revenue at their retail location. Hemp products make up 45% of what they sell. Simply Hemp will lose approximately $225,000 in revenue this year because of the near total wipeout of their hemp inventory. With such a massive decrease in their total anticipated revenue, they will likely not be able to keep up with their regular payments. They might be forced to close their retail location completely.

180.    Simply Hemp purchases from several of the other Plaintiffs in this case, including Cypress Hemp, Redfern Hemp Co., and Pure Shenandoah. This demonstrates the interconnected nature of the damages these Plaintiffs are experiencing at every level of the hemp industry. If one of these entities suffers, so will the others.

181.    Simply Hemp serves approximately 7,400 customers a year.[37] The loss of a significant portion of their inventory will mean less foot traffic to their business. This is likely to have an impact on purchases that are made on non-hemp products elsewhere in their store.

182.    Simply Hemp is also harmed because the owners and employees may face criminal charges under Va. Code §§ 18.2-247 and 371.2 for possession of Banned Products that were previously considered legal.

## FACTUAL DISTINCTIONS FROM EARLIER HEMP CASES

183.    The claims asserted by Plaintiffs in this action are different from those addressed by the Fourth Circuit Court of Appeals in *Northern Virginia Hemp and Agriculture, LLC v. Commonwealth*, No. 23-2192 (4th Cir. Jan. 7, 2025).

---

[37] Simply Hemp serves many customers who are medically fragile and are referred to their location by a physician. Because of this Hemp Prohibition, many customers will not be able to receive the medication that they have become reliant upon.

184. With the sole exception of Plaintiff NOVA Hemp, the Plaintiffs in this complaint consist entirely of different commercial entities suffering particularized harm from Virginia's new Hemp Prohibition who were not parties to the *Northern Virginia Hemp* litigation .

185. The holding in *Northern Virginia Hemp* was limited to a statutory preemption analysis under the Supremacy Clause, evaluating whether the 2018 Farm Bill preempted the Commonwealth's authority to impose total THC concentration limits.

186. The Fourth Circuit in *Northern Virginia Hemp* did not address, resolve, or immunize the Commonwealth from independent constitutional liability under the Takings Clause of the Fifth Amendment for the retroactive economic destruction of existing property.

187. The Plaintiffs in this complaint are licensed Virginia processors and retailers with vested property rights that face direct enforcement actions resulting in economic deprivation due to the enforcement of the new Hemp Prohibition.

188. A judicial finding that a state law is not preempted by federal statute does not excuse an uncompensated and regulatory destruction of vested property rights. Plaintiffs here challenge the uncompensated regulatory seizure and economic damage of their existing, lawfully acquired hemp products and inventory.

## COUNT I

### TAKING WITHOUT JUST COMPENSATION UNDER THE FIFTH AND FOURTEENTH AMENDMENTS AND THE VIRGINIA CONSTITUTION
(Violation of U.S. Const. amend. V, XIV, and Va. Const. art. I, § 11)

189. Plaintiffs repeat and reallege each of the allegations in the preceding paragraphs.

190. The Takings Clause of the Fifth Amendment, made applicable to the states, including Virginia, through the Fourteenth Amendment of the United States Constitution, prohibits the government from taking private property for public use without providing just compensation.

*Chicago, Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 233, 241 (1897) (describing that "[a] judgment of a state court, even if it be authorized by state statute…without compensation made or secured to the owner…is wanting in the due process of law required by the 14th Amendment of the United States Constitution.")

191.     The United States Supreme Court recognizes that constitutional takings come in two distinct forms: (1) A physical taking, where the government "directly appropriates private property or ousts the owner from his domain" and "tests focus[es] directly upon the severity of the burden that government imposes upon private property rights." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005); or (2) A regulatory taking, where the government "imposes regulations that restrict an owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).

192.     In tandem with the Fifth Amendment, the Constitution of Virginia provides that "no person shall be deprived of his life, liberty, property without due process of law…that the General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use. No private property shall be damaged or taken…without just compensation to the owner thereof." VA. CONST. art. I, § 11.

193.     The protections guaranteed by Article I, Section 11 of the Virginia Constitution are distinct from and broader than their federal counterpart, as Virginia mandates compensation not only when property is completely "taken," but also when it is directly "damaged" by government interference or severe regulatory restriction. *Id*.

194.     Further, Va. Code § 1-219.1 also declares "[t]he right to private property [is] a fundamental right, the General Assembly shall not pass any law whereby private property shall be taken or damaged for public uses without just compensation". Here, Virginia statutory law

broadens the scope of compensable governmental interference, capturing both direct physical appropriations and severe regulatory deprivations that inflict measurable economic harm on an owner's property interests. Va. Code Ann. § 1-219.1.

195.    The prohibition against uncompensated takings applies explicitly to the direct appropriation or destruction "of property—personal or real." *Horne v. Dep't of Agric.*, 576 U.S. 351, 360 (2015). In addition to direct physical appropriations, a state restriction on the use of property constitutes an unconstitutional regulatory taking if the restriction goes "too far." *Id.*; *see also Cedar Point*, 594 U.S. at 148. (describing a regulatory taking as occurring "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulation that restrict an owner's ability to use his own property."). "[W]hile property may be regulated to a certain extent, if statutory amendment goes too far it will be recognized as a taking." *Id*. at 148. The Supreme Court has indicated that to determine whether a use restriction affects a taking, a court must balance "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id*.

196.    Here, Plaintiffs hold fundamental and constitutionally protected private property interests in both real property (comprising the farmlands) and personal property (comprising the hemp inventory).

197.    Defendants' enforcement of the new Hemp Prohibition outlaws the sale, distribution, and commercial use of Plaintiffs' inventory by removing the 25:1 CBD-to-THC ratio exception and capping total package THC at 2 milligrams.

198.    The adoption of the Hemp Prohibition via the Conference Report results in a particularized and immediate harm to the Plaintiffs by devaluing their inventories and associated economic values.

199.    By enforcing the new Hemp Prohibition to illegalize the hemp products that used to be legal, Defendants damaged Plaintiffs' agricultural operations. Defendants facilitated the functional destruction and forced disposal of Plaintiffs' lawful hemp inventory. Therefore, Defendants have "taken or damaged" Plaintiffs' property for a public purpose.

200.    The Fifth Amendment is self-executing and triggers as soon as government takes the property, without needing to rely on state remedies before seeking a federal remedy. *Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180, 194 (2019).

201.    The aggrieved person has a claim for unconstitutional taking at the time that the property was taken without compensation. *Id*. at 202.

202.    Under Virginia law, the state's power to take or damage private property is strictly confined. Va. Code § 1-219.1(A) explicitly dictates that the term "public uses" is defined to "embrace only" six narrowly enumerated categories of property acquisition. Defendants' forced shutdown of Plaintiffs' farm and destruction of inventory does not satisfy any of the six authorized criteria set forth in Va. Code § 1-219.1(A)(i)-(vi).

203.    As established by the Supreme Court of Virginia, "what constitutes a 'public use' is a judicial question to be decided by the courts." *City of Richmond v. Carneal*, 129 Va. 388, 394, 106 S.E. 403, 405 (1921); accord *Ottofaro v. City of Hampton*, 265 Va. 26, 31, 574 S.E.2d 235, 237 (2003) (holding that "the issue of 'whether a taking is for a public purpose is a judicial question, reviewable by the courts'"). Here, there is no defined "public use" for the taking, as represented by the Hemp Prohibition, as the General Assembly held no hearings and made no findings regarding "harm" from the use of industrial hemp.

204.    Collectively, Plaintiffs developed or acquired their hemp product inventory during which time the inventory fully complied with all then-applicable requirements of Virginia law,

including the Virginia Industrial Hemp Prohibition, Va. Code Ann. § 3.2-4112 et seq., and the Virginia Food and Drink Law, Va. Code Ann. § 3.2-5100 et seq., as well as the administrative statutory amendment promulgated by VDACS under 2VAC § 5-317. and the written compliance guidelines issued by CCA.

205.    It is well established that the United States Constitution "protects rather than creates property interests," which are instead "determined by 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998); *see also Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (noting that "'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking").

206.    The enforcement actions strip Plaintiffs' agricultural properties of their lawful and economically beneficial use, making the hemp product inventory, business infrastructure, specialized equipment, and lands non-viable.

207.    Pursuant to Va. Code § 1-219.1(G), the government is strictly prohibited from executing a taking that leaves a property owner saddled with an "uneconomic remnant" without offering to acquire the property for its full fair market value.

208.    Further, Va. Code § 1-219.1(E) grants a property owner the express right to challenge whether a "taking or damaging is for a public use," or if "the stated public use is a pretext for an unauthorized use" in violation of the strict multi-factor balancing test mandated by Va. Code § 1-219.1(D).

209.    Under Va. Code § 1-219.1(D), private property cannot be legally taken or damaged unless "the public interest dominates the private gain" and "the primary purpose is not private

financial gain, private benefit, an increase in tax base or tax revenues, an increase in employment, or economic development."

210. By replacing federal agricultural standards with economic policies that weaponize the authority to eliminate a distinct, federally compliant market, the path is cleared for a state-monopolized retail marijuana regime scheduled for 2027. Specifically, the Commonwealth has legalized and commercialized the marijuana industry as a whole but selectively singled out and dismantled the independent hemp industry.

211. This contradicts the Commonwealth's "public safety" rationale in the new Hemp Prohibition which claims independent hemp products pose an intolerable threat to public health while the Commonwealth simultaneously permits and promotes a state-run marijuana marketplace distributing the chemical compounds at significantly higher potencies.

212. Even if the Commonwealth's regulatory overreach is not deemed a *per se* physical taking, it constitutes an unconstitutional regulatory taking under the multi-factor inquiry established in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). Defendants' actions constitute an unconstitutional regulatory taking demanding just compensation based on three distinct factors:

    i.    **Total Economic Impact:** The enforcement of Virginia's new marijuana and hemp laws created by HB 30 inflicts an immediate 100% diminution of value on Plaintiffs' lawfully acquired hemp product inventory, rendering a valuable commercial asset completely worthless and forcing the collapse of Plaintiffs' businesses and revenues. Beginning August 15, 2026, any product exceeding 2 milligrams of total THC per package — regardless of CBD content — can no longer be manufactured or sold as a hemp product in Virginia.

ii.    **Interference with Reasonable and Investment-Backed Expectations:**
Plaintiffs' commercial expectations were shaped and secured by the Commonwealth
through a statutory registration system. Plaintiffs followed the law, paid required fees, and
obtained state registrations. This establishes a contrast to cases where courts rejected
takings claims due to a lack of individualized state assurances.

For instance, in *Homegrown Bar & Grill LLC v. Government of the Virgin Islands*,
the federal district court granted a Temporary Restraining Order blocking the enforcement
of a statutory hemp ban that forced licensed retailers to surrender or destroy existing
inventory without compensation. The court recognized that operators who built businesses
in absolute compliance with an active licensing mechanism possess investment-backed
property interests that the government cannot abruptly extinguish without just
compensation. No. 3:26-cv-00006 (D.V.I. Feb. 25, 2026). [38] Like the litigants in
*Homegrown*, Plaintiffs here relied on commercial guarantees and approvals used by the
Commonwealth to induce capital investments. By criminalizing the compliant hemp
products, the new Hemp Prohibition destroyed the very laws that the Commonwealth itself
used to induce Plaintiffs' capital investments.

One important factor to consider here is that a sales restriction should be treated
the same as a physical surrender. This is because when a statutory amendment like HB 30
strips a commercial asset of its only viable market utility, forcing the Plaintiffs to hold it
until it inevitably expires and rots, the law treats that restriction as a de facto physical
destruction. *Yancey v. United States*, 915 F.2d 1534, 1542 (Fed. Cir. 1990) ("When adverse

---

[38]    https://www.govinfo.gov/content/pkg/USCOURTS-vid-3_26-cv-00006/pdf/USCOURTS-vid-3_26-cv-00006-0.pdf

44

economic impact and unanticipated deprivation of an investment backed interest are suffered…compensation under the Fifth Amendment is appropriate. Even when pursuing the public good…"). Here because HB 30 completely bans the possession, transport, and sale of these compliant products owned by the Plaintiffs, the enforcement of HB 30 has caused "the total destruction . . . of all value" in Plaintiffs' property, which carries "every possible element of compensable U.S. Const. amend. V taking." *Armstrong v. United States*, 364 U.S. 40, 48 (1960). Under these circumstances, the absolute sales ban functions as the exact legal and economic equivalent of a physical seizure.

      iii.      **Character of Government Action:** The governmental action here does not represent a minor regulatory adjustment but targets a highly regulated industry of compliant and legally registered business owners, forcing them to bear the entire economic burden of a sudden statutory shift. By enacting an August 15, 2026 deadline, the Commonwealth criminalizes and effectively mandates the physical destruction of commercial inventory it expressly licensed and induced just weeks prior.

213.    Defendants have performed an unconstitutional regulatory taking by removing the Plaintiffs' ability to use their inventory economically, without allowing a grandfathering period, transition process, or providing just compensation. As a result, Plaintiffs have experienced significant financial loss and should receive just compensation and an injunction to stop enforcement of the statutory amendment.

214.    Under *Knick v. Township of Scott*, the Supreme Court overturned the pre-condition of state-litigation from its *Williamson County* case, holding that this requirement imposed an unjustifiable burden on the assertion of the Fifth Amendment. The Court states that "a property

owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." 588 U.S. 180, 185 (2019).

215.    Because a takings claim is a core civil rights violation, the Court emphasized that "the settled rule is that 'exhaustion of state remedies is not a prerequisite to an action under [42 U.S.C.] §1983'." *Id.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 480 (1994)). Thus, Plaintiffs have no requirement to file in state court.

216.    Plaintiffs' constitutional injury arose at the time of the state action imposed by the new Hemp Prohibition, establishing their right to seek relief directly in federal court.

## COUNT II
## VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS
## PERMANENT INJUNCTIVE RELIEF

217.    Plaintiffs repeat and reallege all of the paragraphs contained herein.

218.    The enforcement of the new Hemp Prohibition constitutes concrete, particularized, and actual injury-in-fact that satisfies the constitutional standing requirements of Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

219.    Defendants cannot defeat standing or avoid liability by asserting that Plaintiffs lack a legally protected interest or a cognizable property right on the theory that the subject products face restrictions under federal law. The Supreme Court has long established that Article III standing "in no way depends on the merits of the Plaintiffs' contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

220.    Because Plaintiffs' hemp product inventory was fully authorized, licensed, and lawful under Virginia law – without any warning otherwise -- at the time of its acquisition (i.e., prior to June 16, 2026), it constitutes a vested, cognizable property interest entitled to full constitutional protection. Under Article III standing doctrine, the severe economic destruction

46

inflicted by the state's sudden prohibition satisfies the injury-in-fact requirement. The state cannot escape jurisdictional oversight by infusing a merits-based "legal right" test into a baseline standing inquiry. The financial wipeout of a compliant business asset is judicially cognizable injury. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).

221.    A strict reading of *Lujan*'s "legally protected interest" standard in this context would lead to an anomalous result. If a Plaintiffs' Article III standing turned on a court first finding perfect adherence to federal requirements, states could easily sidestep constitutional and preemption review by pointing to an alleged violation of the very federal standards the state may be legally forbidden to enforce.

222.    On the merits, federal jurisprudence establishes that when the government forces the economic destruction of physical inventory legally purchased under explicit prior regulatory approval, it cannot escape its constitutional obligations merely by justifying its action under the banner of public safety. The court in *The Modern Sportsman, LLC v. United States*, 145 Fed. Cl. 575, 580–81 (2019), shielded the government under a narrow police power exception, and the court there recognized that those small business owners faced a sudden ban on a specific subset of previously authorized products.

223.    In assessing those conditions, Senior Judge Smith noted that "[i]n a private context, what occurred would be remedied by the concept of justifiable reliance and plaintiffs would be compensated." *Id*. at 576. Importantly, the *Modern Sportsman* court only denied a taking because the underlying property was ultimately classified as a statutory "machinegun," a dangerous item stripped of standard Second Amendment protections.

224.    The arbitrary nature of this deprivation is underscored by the flawed legislative process through which it was enacted. HB 30 was finalized and pushed through the General

Assembly through a closed-door Conference Report[39], completely bypassing standard committee hearings, independent industry analysis, and hemp industry stakeholder input. Indeed, nobody was given a chance to testify or suggest amendments – instead, an entire industry was erased through a closed process.

225.    By eliminating the 25:1 statutory safe harbor through an expedited budgetary maneuver, Defendants failed to establish any empirical, evidence-based justification for the unscientific 2 milligram total THC cap. This total absence of legislative fact-finding or administrative due process demonstrates that the resulting law is a purely arbitrary exercise of state police power designed to destroy a legal market without fair notice or a rational basis.

226.    Furthermore, Defendants cannot avoid liability under *Andrus v. Allard*, 444 U.S. 51 (1979). In *Andrus*, the Supreme Court held that a prohibition on the sale of lawfully acquired property did not effect a taking because the owners retained other core strands in the bundle of property rights, specifically noting that "[t]he regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them." *Andrus*, 444 U.S. at 52. "It is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds." *Id*. at 65-66.

227.    Unlike the artifacts in question in *Andrus*, Defendants' regulatory framework through enforcing HB 30 operates as a seizure and destruction of Plaintiffs' property. The Supreme Court acknowledged in *Andrus* that a regulation must be evaluated by looking at the "aggregate" property rights, noting that "the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Id*. at 66.

---

[39] H.D. 1, 2026 Session, at Item 4-14 #4c (Va. 2026) (enacted as Chapter 1 of the Acts of Assembly, 2026 Special Session I), https://budget.lis.virginia.gov/get/budget/5163/HB30/1081890.PDF.

228.  Here, because underlying agricultural and commercial products have a fixed shelf-life and are now banned from any lawful public display, the state has not merely severed one strand of the property bundle—it has annihilated the bundle in its entirety. As the Supreme Court held in *Lucas v. South Carolina Coastal Council* that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." 505 U.S. 1003, 1019 (1992).

229.  While the General Assembly's conference report ultimately approved these new Hemp Prohibition provisions within the HB 30 budget bills, this rushed process failed to consider hemp industry input or the severe adverse effects on small businesses.

230.  The lack of procedural due process and fair notice is further demonstrated by the compressed compliance timeline forced upon hemp industry stakeholders. The only correspondence Plaintiffs ever received was an electronic communication from VDACS on July 6, 2026, titled "Important Updates from VDACS Hemp Enforcement."

231.  The email provided formal notice of the abrupt elimination of the 25:1 ratio, leaving business owners a mere 40 days to completely reformulate their product lines, overhaul retail packaging, alter manufacturing contracts, or "face penalties related to the packaging, labeling, and testing of edible hemp products under Article 4 of the Industrial Hemp Law" starting August 15, 2026.  The July 6, 2026 email from VDACS is attached as Exhibit B.

232.  As a direct and proximate result of Defendants' unlawful administrative actions and procedural violations, Plaintiff has suffered, and will continue to suffer severe financial hardship, operational disruption, loss of business goodwill, and immediate economic injury.

233.  The lack of any grandfathering provisions, waivers, or wind-down accommodations in the new Hemp Prohibition confirms the concrete nature of Plaintiffs' injury-

in-fact. By compelling an immediate, involuntary forfeiture of existing hemp products and assets, the enforcement of the new law creates instant economic and financial damages to Plaintiffs.

234. This deprivation of the hemp product inventory's commercial utility constitutes severe economic harm that satisfies the threshold of a judicially cognizable injury for Article III standing purposes and establishes a clear violation of Fourteenth Amendment Due Process.

**COUNT III**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**OF THE FOURTEENTH AMENDMENT**
**(42 U.S.C. § 1983)**

235. Plaintiffs repeat and reallege all of the paragraphs contained herein.

236. The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).

237. Because the classifications drawn by the new Hemp Prohibition do not burden a fundamental right or target a suspect class, they are subject to rational basis review: the classification must bear a rational relationship to a legitimate governmental purpose. *Id.* at 440. An equal protection plaintiff must plead sufficient facts to demonstrate plausibly that they were treated differently from others who were similarly situated, and that the unequal treatment was arbitrary or lacking a rational basis. *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011).

238. A classification fails where no reasonably conceivable state of facts provides a rational connection between the legislative distinction and the purpose invoked to defend it. *Giarratano v. Johnson*, 521 F.3d 298, 303–04 (4th Cir. 2008); *Siena Corp. v. Mayor & City Council of Rockville*, 873 F.3d 456, 465 (4th Cir. 2017). A classification whose practical effect is untethered

50

from the interest the government asserts cannot survive even deferential review. *Romer v. Evans*, 517 U.S. 620, 632–33 (1996).

239.    Defendants' asserted justification for the 2-milligram total THC per-package cap is the protection of public health and consumer safety from intoxicating hemp-derived products.

240.    The classification drawn by the new Hemp Prohibition bears no rational relationship to that asserted purpose because it measures legality by aggregate milligrams of total THC per package, without regard to concentration, serving size, or intoxicating effect. Under the 2-milligram cap, a concentrated one-ounce tincture containing 1.9 milligrams of total THC remains lawful, while a twelve-ounce beverage containing 2.1 milligrams of total THC, diluted to a fraction of the tincture's concentration and incapable of producing a comparable intoxicating effect, is a criminal offense. A metric that permits the more concentrated product while criminalizing the more diluted one is not a public-safety line; it is an arbitrary one.

241.    Defendants assert that its legitimate interest in enacting this restriction is to protect public health and prevent consumer intoxication. However, the state's enforcement mechanism calculates compliance strictly by aggregate mass per package, completely ignoring fluid volume, concentration, serving size, or dilution. According to official guidelines issued by VDACS, effective August 15, 2026, a compliant hemp product "may not have more than two milligrams of total THC per package."[40]

242.    The irrationality of the classification is confirmed by the Commonwealth's simultaneous and coordinated expansion of its state-licensed retail marijuana market, announced by the Governor on June 16, 2026, the same day the hemp restrictions were announced. Under that

---

[40] *See* Virginia Department of Agriculture and Consumer Services, *Hemp Product Enforcement* (last accessed July 30, 2026) https://www.vdacs.virginia.gov/food-hemp-product-enforcement.shtml.

framework, identical or materially greater quantities and concentrations of THC remain lawful for sale through state-licensed marijuana dispensaries. The Commonwealth cannot rationally maintain that 2.1 milligrams of THC in a hemp beverage sold by a licensed Virginia hemp business threatens public health, while materially higher doses of the same compound sold through a state-licensed dispensary do not.

243.    The classification thus tracks retail channel and market structure, not the chemical or public-safety characteristics the statute purports to regulate. Plaintiffs, licensed and compliant Virginia hemp businesses, are similarly situated to state-licensed marijuana retailers with respect to the only characteristic the Commonwealth invokes to justify the law: the sale of THC-containing products to Virginia consumers. The new Hemp Prohibition treats these similarly situated sellers in a starkly disparate manner without any rational connection to the asserted public-health purpose.

244.    The U.S. Supreme Court has struck down regulations under rational-basis review when the statutory classification is disconnected from the law's public purpose. In *Romer v. Evans*, the Court reinforced that even under the most deferential standard, the state cannot escape the requirement of a logical nexus between its classification and its target. The Court stated the Fourteenth Amendment's "promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another... a law must bear a rational relationship to a legitimate governmental purpose." 517 U.S. 620, 635 (1996).

245.    Because the challenged classification is arbitrary and bears no rational relationship to any legitimate governmental purpose, the new Hemp Prohibition violates the Equal Protection Clause of the Fourteenth Amendment, and Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983 barring its enforcement.

246.    Plaintiffs' claims above all involve irreparable harm if relief is not immediately granted by the Court. There is no adequate remedy at law.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, and grant the following relief:

I.    Declare that the new Hemp Prohibition and its accompanying statutory amendment are a regulatory taking lacking sufficient public use and/or were adopted in violation of the Fifth and Fourteenth Amendments of the United States Constitution;

II.    Declare that the new Hemp Prohibition violates the Equal Protection Clause of the Fourteenth Amendment and/or the Due Process Clause of the United States Constitution;

III.    Award temporary and permanent injunctive relief enjoining Defendants and all those similarly situated from enforcing the 2 mg THC per-package cap against Plaintiffs or those similarly situated (alternately enjoin Defendants and all those similarly situated from pursuing all civil and criminal remedies or penalties for all hemp products that meet the 25-to-1 exception that was codified in Virginia Law prior to the passage of HB30 in 2026).

IV.    Enjoin each Defendant, along with its officers, agents, and employees, from enforcing or taking any administrative, civil, or penal actions pursuant to the Hemp Prohibitions or any ordinances passed thereunder until further order of this Court;

V.    Award Plaintiffs damages pursuant to 42 U.S.C. § 1983 in an amount to be determined at trial;

VI.     Award Plaintiffs reasonable attorney's fees, expert witness fees, and taxable court

costs incurred in this action pursuant to 42 U.S.C. § 1988(b);

VII.    Grant such other and further relief as this Court deems just and proper.

Dated: July 31, 2026                           Respectfully submitted,

                                               NORTHERN VIRGINIA HEMP &
                                               AGRICULTURE, LLC,

                                               REDFERN HEMP, CO.,

                                               DISTRICT HEMP BOTANICALS, LLC

                                               PURE SHENANDOAH,

                                               CYPRESS HEMP,

                                               KULTIVATE WELLNESS

                                               SIMPLY HEMP

                                               By Counsel

By: ____*/s/ J. Chapman Petersen*_____
J. Chapman Petersen, Esq., VSB No. 37225
Federico J. Zablah., VSB No. 96031*
CHAP PETERSEN & ASSOCIATES, PLC
3970 Chain Bridge Road
Fairfax, VA 22030
Telephone: 571-459-2512
Facsimile: 571-459-2307
jcp@petersenfirm.com
fjz@petersenfirm.com
*Counsel for Plaintiffs*

*\* Admitted to practice in the Eastern District of Virginia; application for admission to the Western District of Virginia forthcoming*

54